IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DAEDALUS BLUE, LLC,

Plaintiff,

v.

DROPBOX, INC.,

Defendant.

C.A. No. 24-998 (CFC)

**OPENING BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Brian P. Egan (#6227)
Lucinda C. Cucuzzella (#3491)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
ccucuzzella@morrisnichols.com

*Attorneys for Defendant*

OF COUNSEL:

Gregory Lantier
Amanda L. Major
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

Liv Herriot
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6000

November 8, 2024

# TABLE OF CONTENTS

**Page**


I. NATURE AND STAGE OF THE PROCEEDINGS ........ 1

II. SUMMARY OF THE ARGUMENT ........ 1

III. STATEMENT OF FACTS ........ 3

IV. ARGUMENT ........ 3

- A. Legal Standard ........ 3
- B. The ’957 Patent Claims Patent-Ineligible Subject Matter ........ 4
  - 1. *Alice* Step One: All ’957 Claims Are Directed to the Abstract Idea of Filtering Information Based on Rules ........ 6
  - 2. *Alice* Step Two: The ’957 Claims Recite No Inventive Concept ........ 9
- C. The ’726 Patent Claims Patent-Ineligible Subject Matter ........ 12
  - 1. *Alice* Step One: All ’726 Claims Are Directed to the Abstract Idea of Organizing Information Based on its Content and Characteristics ........ 15
  - 2. *Alice* Step Two: The ’726 Claims Recite No Inventive Concept ........ 16
- D. The ’269 Patent Claims Patent-Ineligible Subject Matter ........ 18
  - 1. *Alice* Step One: All ’269 Claims Are Directed to the Abstract Idea of Managing Records of Stray Information ........ 19
  - 2. *Alice* Step Two: The ’269 Patent Claims Recite No Inventive Concept ........ 20

V. CONCLUSION ........ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014)....................4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................3

*In re Bilski*,
545 F.2d 943 (Fed. Cir. 2008) (en banc)....................8

*BSG Tech. LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)....................16

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
935 F.3d 1341 (Fed. Cir. 2019)....................10, 18

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015)....................3

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017)....................9, 17, 21

*Ericsson Inc. v. TCL Commc'n Tech.*,
955 F.3d 1317 (Fed. Cir. 2020)....................7

*Glasswall Sols. Ltd. v. Clearswift Ltd.*,
754 F. App'x 996 (Fed. Cir. 2018)....................7

*Guvera IP Pty Ltd. v. Spotify, Inc.*,
2022 WL 4537999 (S.D.N.Y. Sept. 28, 2022)....................20

*Intellectual Ventures I LLC v. Capital One Bank (USA), N.A.*,
792 F.3d 1363 (Fed. Cir. 2015)....................11, 17

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
850 F.3d 1332 (Fed. Cir. 2017)....................21

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
850 F.3d 1315 (Fed. Cir. 2017)....................2, 16

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ....................1, 6, 7

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ....................2, 16, 20

*Realtime Data LLC v. Array Networks Inc.*,
556 F. Supp. 3d 424 (D. Del. 2021),
*aff'd*, 2023 WL 4924814 (Fed. Cir. 2023)....................12

*Secured Mail Sol'ns LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ....................12

**Statutes**

35 U.S.C. § 101 ....................1, 4, 8, 21

## I. NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Daedalus Blue, LLC ("Daedalus") filed this action on August 30, 2024, alleging that Defendant Dropbox, Inc. ("Dropbox") infringes U.S. Patents 7,542,957; 8,131,726; and 8,176,269. Dropbox moves to dismiss because no claim recites patent-eligible subject matter under 35 U.S.C. § 101.

## II. SUMMARY OF THE ARGUMENT

Each asserted patent claims only patent-ineligible subject matter under 35 U.S.C. § 101 and is therefore invalid. The '957 patent claims filtering information based on rules. That is a longstanding practice that has been performed in legion non-computer contexts since long before the advent of computers and the Internet. For example, people have long distinguished unwanted junk mail from other mail based on certain characteristics of the mail, such as when it is addressed to "Current Resident" rather than a specific person. While the claims of the '957 patent limit the abstract idea to the environment of "validating requests to a Web application," stripped of conventional computing devices and methods, they recite nothing more than this longstanding practice. The Federal Circuit has consistently held similar claims invalid. *E.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313-14 (Fed. Cir. 2016) (claims to "filtering e-mails that have unwanted content" invalid).

The '726 patent claims are similarly directed to computer implementation of

a longstanding practice: organizing documents by their content and characteristics. People organized information in that way long before computers. Libraries, for example, traditionally organized collections of books, including multiple copies of the same book, using card catalogs. And card catalogs organized their collections based on both the book's content as well as other characteristics, such as by author, edition, and format (e.g., print or audiobook). The '726 patent claims merely implement the same idea in the context of computer-based search engines, and courts have also routinely found claims of this type ineligible for patenting. *E.g.*, *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327-29 (Fed. Cir. 2017) (claims directed to "creating an index and using that index to search for and retrieve data" invalid).

Finally, the '269 patent claims are directed to the abstract idea of managing stray records—i.e., records that no longer correspond to any item in storage—using conventional computing technology. But courts have repeatedly held such claims to managing data ineligible for patenting. *E.g.*, *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1315-19 (Fed. Cir. 2021) (claims directed to using content-based identifiers to manage data ineligible).

Each specification acknowledges that the claimed methods are implemented using conventional computing devices and methods, and therefore none recites an inventive concept sufficient to transform the claims into patent-eligible subject

matter. Accordingly, all claims of the asserted patents are invalid, and the complaint should be dismissed.

## III. STATEMENT OF FACTS

Daedalus is a non-practicing entity that purchased the asserted patents from IBM in 2019 for an average price of $18,000 each. Ex. 1. The patents have not previously been asserted. The complaint appears to have been assembled without much diligence, and the case lacks merit for numerous reasons in addition to the ineligibility of the asserted claims. For example, Daedalus's complaint concedes that Dropbox was licensed by IBM but pleads "on information and belief" that Dropbox's license has expired. D.I. 1, ¶3. Yet Daedalus appears not to have asked IBM or Dropbox about the status of that license—which remains in force—prior to filing suit.

## IV. ARGUMENT

### A. Legal Standard

To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because "an invalid patent cannot be infringed," *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644 (2015), Daedalus's complaint does not state a claim for patent infringement.

The Supreme Court has long recognized that "[l]aws of nature, natural

phenomena, and abstract ideas are not patentable" under 35 U.S.C. § 101. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

In *Alice*, the Supreme Court established a two-step framework for determining whether an invention claims a law of nature, natural phenomenon, or abstract idea and is patent-ineligible. *Id.* at 217. First, the court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* Second, if they are, the court must "consider the elements of each claim both individually and as an ordered combination" to determine whether there is an "inventive concept." *Id.* at 217-18.

**B. The '957 Patent Claims Patent-Ineligible Subject Matter**

The '957 patent is titled "Rich Web Application Input Validation" and claims "method[s] for validating a request to a Web application." D.I. 1-1 ('957 patent) at 13:10 (claim 1). "Validating" refers to determining whether to accept or reject incoming data. *Id.*, 2:42-46 (defining "input validation" as "the act of checking data entering a Web application for processing" and stating that "input validation consists of accepting only data deemed acceptable to a Web application, or rejecting data that could be offensive to the Web application"). As the patent explains, input validation was done conventionally in the prior art to prevent "malicious data" from being received by the Web application. *Id.*, 2:41-42. However, according to the patent, input validation systems utilized "custom validation code," and "writing and

maintaining custom validation code is not efficient." *Id.*, 3:26-28, 3:46-47.

Instead of custom code, the patent describes using generic "rules" for input validation. *Id.*, 8:21-22. As an example, the '957 patent explains that a "validation rule" can require a parameter "isgoodcustomer" to have the value "true" or "false." *Id.*, 8:24-25. Each validation rule can, in turn, have multiple "validation rule primitives [VRPs]," which "define data to be accepted or rejected in rules." *Id.*, 8:53-54, 10:52. The patent claims do not recite any distinctions from the traditional design or operation of validation engines.

The '957 patent includes 31 claims; claims 1, 2, 21, and 22 are independent. Daedalus's complaint asserts only that Dropbox infringes "at least" claim 2. Claim 2 recites:

> 2. A method for validating a request to a Web application, the request having a data comprising:
>
> creating a validation engine in a programmable processor, the validation engine comprising a validation logic, said validation logic comprising a validation rule, said validation rule corresponding to a defined plurality of data elements;
>
> loading said validation rule;
>
> applying said validation rule to said data elements; and
>
> sending said request to the Web application.

The other independent claims are substantially similar to claim 2 with respect to the issues herein. The dependent claims add elements that specify (1) where the validation occurs in a computer network or software program (3, 6, 23, 26), (2) the

form of particular rules (4, 8-9, 13-14, 18, 24, 27-28), (3) the operation of particular rules (10-11, 15-17, 29-31), (4) how rules are selected (5, 19, 25), or (5) limit the claims to particular use cases (7, 12, 20).

### 1. *Alice* Step One: All '957 Claims Are Directed to the Abstract Idea of Filtering Information Based on Rules

All '957 patent claims are directed to the abstract idea of filtering information based on rules, a long-standing practice applied in numerous contexts before computers or the Internet. For example, "it was long-prevalent for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail." *Symantec*, 838 F.3d at 1314. The '957 patent claims are directed to the same longstanding practice, only instead of filtering mail by mentally applying a rule that says 'throw away mail that looks like a generically addressed advertisement,' the claims describe filtering electronic data by applying rules to decide whether to accept or reject a request to a Web application, such as 'reject requests that are less than ten characters long.' *See* '957 patent, 8:67-9:1.

Each claim merely describes implementing this long-prevalent practice using conventional computing devices. For example, claim 2 recites "[a] method for validating a request to a Web application." As noted above, that "validation" consists of "accepting only data deemed acceptable … or rejecting data that could be offensive." *Id.* 2:44-46. Claim 2's individual limitations merely spell out the

process of filtering information based on rules: (1) "creating a validation engine" that comprises a "validation logic," which comprises a "validation rule"; (2) "loading" the validation rule; (3) "applying" the validation rule to the "data elements" of the request; and (4) sending the request to the Web application. The Federal Circuit has repeatedly (and consistently) found such claims directed to an unpatentable abstract idea. *E.g.*, *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020) (claims to "controlling access" by "receiving a request" and "determining if the request should be granted" directed to an abstract idea); *Glasswall Sols. Ltd. v. Clearswift Ltd.*, 754 F. App'x 996, 997-98 (Fed. Cir. 2018) ("filtering of electronic files and data" is an abstract concept); *Symantec*, 838 F.3d at 1314 (claims to "filtering e-mails that have unwanted content" directed to an abstract idea).

Indeed, the applicant acknowledged that the claims are directed to filtering information. During prosecution, the Examiner rejected the claims under the pre-*Bilski* "useful, concrete and tangible result" standard. In response, while noting that the "useful, concrete and tangible result" test had been "repudiated" by the Federal

Circuit,[1] the applicant nevertheless argued that "[t]he claimed method provides a tangible, real-world result, ***namely whether a request will reach (sent to) a Web application***." Ex. 2 at 8.[2]

The other independent claims of the '957 patent are directed to the same abstract idea. Claim 1 recites a materially identical preamble to claim 2 and the same four steps for filtering information based on rules. The only differences are that claim 1 recites (1) a "rich validation rule"; (2) that the "rich validation rule" uses a "plurality of ordered validation rule primitives (VRPs)" that comprise an "acceptance VRP, a rejection VRP, [or] a combination thereof"; and (3) that the data is accepted if at least one of the "acceptance VRPs" succeeds and all "rejection VRPs" fail. But specifying the conditions under which a rule applies does not change the abstract nature of the claims; claim 1 is still directed to the fundamental concept of filtering information based on rules. Independent claims 21 and 22 directly correspond to independent claims 1 and 2, but are rewritten as means-plus-function claims.

---

[1] In *State Street Bank & Trust Co. v. Signature Fin. Grp., Inc.*, the Federal Circuit held that a process was patentable under Section 101 if it produces a "useful, concrete and tangible result." 149 F.3d 1368, 1373 (Fed. Cir. 1998). During prosecution of the '957 patent, the Federal Circuit rejected the "useful, concrete and tangible" test in favor of the "machine or transformation test," *In re Bilski*, 545 F.2d 943, 959-60 (Fed. Cir. 2008) (en banc), which the Supreme Court subsequently rejected in favor of the *Alice* two-step framework that federal courts are required to apply today.

[2] Emphasis added unless otherwise noted.

All other claims depend from claims 1, 2, 21, or 22 and are directed to the same abstract idea, and none of the additional limitations changes the focus of the independent claims. As explained above, the additional limitations simply specify where the validation occurs in a computer network or software program, the form or operation of particular rules, how rules are selected, or limit the claims to particular use cases. Accordingly, all claims of the '957 patent fail at *Alice* Step One.

### 2. *Alice* Step Two: The '957 Claims Recite No Inventive Concept

The '957 patent claims also fail at *Alice* Step Two. None of the limitations, either alone or in combination, describes an "inventive concept" that transforms the abstract idea into patent-eligible subject matter. The '957 patent's specification repeatedly acknowledges that the alleged invention can be practiced entirely using generic computing technology. For example, the patent explains that "an exemplary system **100** for implementing the invention may be … ***general purpose computers***," including a "processor," "cache memory," and "hard disk drive." '957 patent, 6:20-53, 12:32-34 ("The invention can be implemented in digital electronic circuitry, or in computer hardware, firmware, software, or in combinations thereof."). Each of these is a conventional computing component insufficient to transform the claims into patent-eligible subject matter, *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1056-57 (Fed. Cir. 2017), and nowhere does the patent suggest that any is used in an unconventional manner to practice the claimed invention.

Consideration of the claim elements themselves—alone or in combination—confirms that the claims do not describe any inventive concept. Claim 2's preamble recites "[a] method for validating a request to a Web application," but the Background acknowledges that Web applications were conventional software elements at the time of the alleged invention "that create web pages from application logic, stored data, and user input." *Id.*, 1:40-41. Nothing in claim 2 describes any unconventional use of the recited Web application. Further, the only technology recited in claim 2's first limitation is a "validation engine," "validation logic," and a "programmable processor," each of which the patent acknowledges was already conventional at the time of the alleged invention. *Id.*, 3:1-5, 3:32-34, 3:47-48. The remaining limitations recite only "loading" and "applying" the rule and "sending" the request to the Web application. But those limitations amount only to performance of the abstract idea of filtering information based on rules, and therefore are not an inventive concept. *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1349 (Fed. Cir. 2019) (inventive concept cannot be "abstract idea that the claims are directed to").

The '957 patent's prosecution history confirms that the claims are implemented using only conventional computing components in their conventional organization. In response to a rejection under the no-longer-applicable pre-*Bilski* standard, *see supra* pp. 7-8, the applicant amended claim 2 to recite "[a] method for

validating a request to a Web application" and "creating a validation in a programmable processor." Ex. 2 at 8, 9. Such limitations are plainly insufficient under *Alice*. Implementation by a generic "programmable processor" has repeatedly been held not to be an inventive concept, and "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use," such as Web applications. *Intellectual Ventures I LLC v. Capital One Bank (USA), N.A.*, 792 F.3d 1363, 1366 (Fed. Cir. 2015).

As noted *supra* pp. 8, the remaining independent claims recite the same arrangement of the individual elements as claim 2, and therefore also lack an inventive concept. Likewise, none of the dependent claim limitations changes the Step Two analysis. As discussed above, the majority of the dependent claims (4, 8-11, 13-16, 18, 24, 27-30) specify certain forms or operation of particular rules, and therefore merely implement the abstract idea itself. Other claims describe how rules are created or selected (5, 17, 19, 25, 31), or describe where the validation occurs in a software program (3, 6, 23, 26), specifically "in an application firewall" or in "an external code module." *See* '957 patent, 2:32-33 ("there are various network level firewall technologies available"). The remaining claims (7, 12, 20) only limit the claims to specific use cases—specifically where "the validation engine serves the Web application" or where "the Web application is an engine creating Web pages"—which is insufficient at Step Two. *Capital One*, 792 F.3d at 1366.

While the claims and specification on their face demonstrate that the claims do not describe any inventive concept, Daedalus's complaint makes conclusory allegations that the '957 patent describes "technical solutions" to "technical problems." D.I. 1, ¶ 23. For support, Daedalus identifies three alleged characteristics of the purported invention, but two are completely disconnected from the claims, *id.*, ¶¶ 25, 27, and the third is simply a straightforward application of the abstract idea of filtering information based on rules to a particular field of use. *Id.*, ¶ 26. Accordingly, the complaint fails to plausibly allege that the claims are not directed to an abstract idea or include an inventive concept. *See Secured Mail Sol'ns LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017); *Realtime Data LLC v. Array Networks Inc.*, 556 F. Supp. 3d 424, 434 (D. Del. 2021), *aff'd*, 2023 WL 4924814 (Fed. Cir. 2023) ("To the extent that the pleadings interpret the text of the patents, [courts are] free to look directly to the patents.").

### C. The '726 Patent Claims Patent-Ineligible Subject Matter

The '726 patent is titled "Generic Architecture for Indexing Document Groups in an Inverted Text Index" and describes "[a] method for indexing a plurality of documents." D.I. 1-3 ('726 patent), Abstract. Describing the prior art, the patent explains that "[d]etection of duplicate documents or other content is an important feature in Web search engines." *Id.*, 1:14-15. Duplicate detection in the context of search engines "identifies duplicate documents to avoid presenting documents with

the same" content in response to a search request. *Id.*, 1:16-18. The well-known way to avoid presenting duplicate results in response to a request was to identify groups of documents with the same content when they are "indexed" by the search engine and "make sure that each result set does not contain more than one document from a same duplicate group." *Id.*, 1:25-29. However, even where the content of duplicate documents is the same, that set of duplicate documents sometimes may have "varying metadata" from one another.[3] *Id.*, 1:51-53. As a result, according to the patent, "simple approaches to handling documents with duplicate data" are insufficient because they cannot reliably distinguish between the duplicate documents when metadata is relevant to the search results. *Id.*, 1:57-67.

The '726 patent describes its alleged distinction over the prior art as "indexing duplicate groups in such a way that indexes the content only once but allows queries to be answered as if the duplicated content was indexed for each document of the group." *Id.*, 2:15-19. Specifically, instead of indexing each document with identical content separately, the search engine indexes the content only once but indexes the metadata for every document in the group. *Id.*, 4:38-43.

The specification expressly states that the document-indexing operations can be performed using conventional computing components. *Id.*, 3:31-32 ("[A]

[3] "Metadata" refers to data about the document, as opposed to the content of the document itself. *See* Ex. 3.

general-purpose computer with appropriate software may be used."), 7:26-34 ("[T]he present invention may be implemented on a conventional IBM PC."). Likewise, it acknowledges that indexing documents and identifying duplicates were "conventionally known." *Id*., 3:36-38, 4:46-48.

The '726 patent includes 26 claims; claims 1, 16, and 23 are independent. Daedalus's complaint asserts only that Dropbox infringes "at least" claim 1. Claim 1 recites:

> 1. A method for indexing a plurality of documents, the method comprising the steps of:
>
> identifying a duplicate group of documents from among the plurality of documents, each of the documents in the duplicate group comprising respective content and metadata, wherein the respective content of each document in the duplicate group is substantially similar and corresponds to a content for the duplicate group;
>
> creating one index of content for the duplicate group;
>
> indexing the metadata for each of the documents in the duplicate group;
>
> receiving a query and executing said query as if duplicated content was indexed for each document of the duplicate group; and
>
> outputting results of said query.

The other independent claims are substantially similar to claim 1 with respect to the issues presented herein. The dependent claims add elements that describe the organization of the duplicate documents (2, 4-8, 17, 19-20, 24), repeat the method for multiple groups of duplicate documents (3, 18), limit the claims to the field of web searching (9-14, 21-22, 25-26), or limit the claims to certain types of metadata

(15).

### 1. *Alice* Step One: All ’726 Claims Are Directed to the Abstract Idea of Organizing Information Based on its Content and Characteristics

All ’726 patent claims are directed to organizing documents using their content and characteristics (i.e., “metadata” in the language of the patent). Claim 1 recites a method requiring: (1) identifying a group of documents that have similar content; (2) creating an “index” of content for the duplicate group; (3) indexing the metadata for each document in the group; (4) receiving and executing a query (i.e., a search request) “as if duplicated content was indexed for each document” in the group; and (5) outputting the results. The only other independent claims (16, 23) recite materially identical methods, styled as “apparatus” and “program product” claims, and recite only conventional computing elements such as a “processor,” “memory,” “storage medium,” and “program code.”

Claims of this type fail at *Alice* Step One because they are directed to an abstract idea. For example, libraries have long organized collections of books, including multiple copies of the same book, using card catalogs. And while the content of a book is substantially similar or identical across every copy, card catalogs allowed for searching for specific copies based on their individual characteristics (i.e., “metadata”), such as whether a particular copy is a hardcover, paperback, or audiobook. As the Federal Circuit has explained, in a library-indexing system,

"classifiers organize and cross-reference information and resources … by certain identifiable tags, e.g., title, author, subject." *Erie*, 850 F.3d at 1327. There, the court held that "this type of activity … includes longstanding conduct that existed well before the advent of computers and the Internet," *id.*, and the Federal Circuit has repeatedly (and consistently) found such claims directed to an unpatentable abstract idea. *See*, *e.g.*, *PersonalWeb*, 8 F.4th at 1319 (claims directed to using content-based identifiers to manage data ineligible); *BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) (claims reciting methods for indexing data ineligible). Thus, all '726 patent claims fail at *Alice* Step One.

#### 2. *Alice* Step Two: The '726 Claims Recite No Inventive Concept

None of the limitations of any claim of the '726 patent, standing alone or as an ordered combination, describes an "inventive concept" at *Alice* Step Two. As noted above, to the extent that the claims recite computer hardware or software (e.g., a "processor," "memory," "storage medium," or "program code"), the specification repeatedly acknowledges that those aspects were well-known and conventional. '726 patent, 3:31-32, 7:26-34. Likewise, the specification acknowledges that identifying duplicate documents and indexing them was conventional at the time of the alleged invention. *Id.*, 3:36-38 ("as is ***conventionally known***, one aspect of the search engine application **104** involves identifying duplicate documents"), 4:46-48 ("as is ***conventionally known***, documents are broken down into tokens and an index

is created that identifies which tokens are contained in which documents"). But the recitation of those conventional and generic elements does not transform the claims into patent-eligible subject matter. *Credit Acceptance*, 859 F.3d at 1056.

None of the dependent claims changes the analysis at Step Two. As noted above, the majority of the dependent claims (2, 4-8, 17, 19-20, 24) merely describe the organization of the duplicate documents. For example, claims 2, 17, and 24 recite designating a "master document" in the group of duplicates. Other claims (3, 18) recite repeating the same method for multiple groups of documents. The remaining dependent claims (9-15, 21-22, 25-26) only limit the claims to the field of web searching, which is plainly insufficient to provide an inventive concept. *Capital One*, 792 F.3d at 1366.

Daedalus's complaint makes conclusory and non-specific allegations that the claims of the '726 patent are "a technological solution to a technological problem" that "present[] an inventive concept over the prior art" and "improve[] the functioning of a document storage and search system." D.I. 1, ¶ 45. However, as noted above, the specification acknowledges that the claims utilize only conventional hardware to perform conventional search engine functions (identifying duplicates and indexing documents). The only remaining alleged unconventionality (indexing the content from one document and indexing the metadata from all of the duplicates) is simply the abstract idea itself, and therefore is not an inventive

concept. *Chamberlain Grp.*, 935 F.3d at 1349.

**D. The '269 Patent Claims Patent-Ineligible Subject Matter**

The '269 patent, titled "Managing Metadata for Data Blocks Used in a Deduplication System," claims a "method, system, and article of manufacture for managing metadata for data blocks used in a deduplication system." D.I. 1-2 ('269 patent), Abstract; *id.*, 1:6-9. The patent explains that data deduplication—as its name suggests—is a pre-existing technique for reducing storage space by eliminating redundant data. *Id.*, 1:11-14. For example, if two files (or portions of files, called "blocks") each contain much of the same text, then the common text needs to be stored only once, with a "pointer" to where that data is stored. *Id.*, 1:14-22. The well-known way to determine whether two blocks of data contain the same content is to calculate a "hash" value from the content of each data block; if the hash values match, then the content of the blocks is the same and only one instance of that data block need be stored. *Id.*, 1:23-32.

Data storage systems keep a record of what data they are storing in metadata. The '269 patent acknowledges that all of this was known. *See id.*, 1:10-50 ("Fig. **1** illustrates a system known in the art for storing data blocks and metadata."). The alleged distinction between the prior art and the '269 patent is the manner in which metadata is managed for deduplication. *Id.*, 1:49-50 ("There is a need in the art for improved techniques for managing metadata used in deduplication."). Specifically,

the patent states that when it is determined that a data block is "unreferenced"—i.e., that there is no longer any file in the system containing that particular data block—the metadata for that data block will indicate it is unreferenced. *E.g.*, *id.*, 5:32-57, 5:58-61. But rather than discarding the metadata for the unreferenced (i.e., no longer in use) data block, the metadata is retained to assist with deduplication when new files are added. *Id.*, 5:50-52 ("[T]he data block metadata for the unreferenced data block is retained to use in deduplication operations.").

The '269 patent specification expressly states that its data management operations can be implemented using conventional computer technology. *Id.*, 6:61-63 (describing "standard programming and/or engineering techniques"). It likewise expressly disclaims that there is anything inventive in the ordered combination of claim elements. *Id.*, 7:62-8:3 ("The steps of processes described herein may be performed in any order practical.").

#### 1. *Alice* Step One: All '269 Claims Are Directed to the Abstract Idea of Managing Records of Stray Information

Consistent with the specification, the '269 patent claims are focused on how to manage records ("metadata") concerning stray ("unreferenced") data blocks. Claim 1 is a method requiring (1) maintaining file-level and data block-level records ("metadata"), which includes a record of the content and location of each data block, (2) determining that a data block is stray ("unreferenced") and indicating as such in the record for that data block, and (3) using that record subsequently if a file is added

to the system that contains the same content as the stray data block. ’269 patent, 8:41-64. The other independent claims recite the same steps, just in system and article of manufacture claims. And each dependent claim simply adds other record-management steps, such as whether and when to delete the record of the stray data (2-3, 6-7, 9, 12-13, 15-16, 19-20), performing a hash value calculation and comparing it to other hash values (4, 10, 17), or copying records to a second computer (5, 11, 18).

Managing records concerning stray information is an abstract idea that is not eligible for patenting, as confirmed by numerous Federal Circuit and district court decisions. *See, e.g.*, *PersonalWeb*, 8 F.4th at 1315-19 (claims directed to using content-based identifiers to manage duplicate data items ineligible); *Guvera IP Pty Ltd. v. Spotify, Inc.*, 2022 WL 4537999, at *5 (S.D.N.Y. Sept. 28, 2022), *aff’d*, 2024 WL 1433505 (Fed. Cir. 2024) (claims directed to matching data based on identifying tags ineligible.).

#### 2. *Alice* Step Two: The ’269 Patent Claims Recite No Inventive Concept

None of the claim elements of any ’269 patent claim—standing alone or as an ordered combination—recites an “inventive concept” at *Alice* Step Two. To the contrary, where the claims recite computer hardware or software such as “computer readable storage” (1, 14), an “Input/Output (I/O) manager” (8), or a “computer readable device” (14), the specification states that technology is well-known and

conventional. ’269 patent, 7:1-7 (“A ***computer readable storage*** medium may comprise storage media such as magnetic storage medium …, optical storage …, volatile and non-volatile memory devices …, etc.”), 3:10-13 (“The system **2** may comprise ***any system suited for managing I/O requests*** … such [as] a storage controller, server, enterprise storage server (ESS), etc.”), 2:56-57 (“The first **10** and second **20** ***computer readable devices*** may each comprise suitable storage devices known in the art.”). That is not an inventive concept. *Credit Acceptance*, 859 F.3d at 1056. Likewise, where the limitations require computing functions, those functions are nothing more than storing data, performing calculations on data, and comparing output results. The law is clear that this is insufficient at *Alice* Step Two to establish an inventive concept. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) (collecting, displaying, and manipulating data insufficient to transform abstract idea into patent-eligible application). Finally, any argument that the “ordered combination” of claimed computer functions is an inventive concept fails because the specification expressly denies that there is any significance to their ordering. ’269 patent, 7:62-8:3.

## V. CONCLUSION

Defendant respectfully requests that the Court find that the patents’ claims recite ineligible subject matter under 35 U.S.C. § 101 and dismiss this action with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*
Brian P. Egan (#6227)
Lucinda C. Cucuzzella (#3491)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
ccucuzzella@morrisnichols.com

*Attorneys for Defendant*

OF COUNSEL:

Gregory Lantier
Amanda L. Major
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

Liv Herriot
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6000

November 8, 2024

**WORD COUNT CERTIFICATION**

The undersigned counsel hereby certifies that Defendant Dropbox, Inc.'s Motion to Dismiss was prepared in 14-point Times New Roman font, and contains 4,936 words, which were counted using the word count feature in Microsoft Word.

Dated: November 8, 2024

*/s/ Brian P. Egan*
Brian P. Egan (#6227)

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 8, 2024, upon the following in the manner indicated:

| | |
|---|---|
| Stephen B. Brauerman, Esquire<br>Ronald P. Golden III, Esquire<br>BAYARD, P.A.<br>600 North. King Street, Suite 400<br>Wilmington, DE 19899<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |
| Denise M. De Mory, Esquire<br>Richard Lin, Esquire<br>Michael E. Flynn-O'Brien, Esquire<br>Gareth DeWalt, Esquire<br>BUNSOW DE MORY LLP<br>701 El Camino Real<br>Redwood City, CA 94063<br>*Attorneys for Plaintiff* | *VIA ELECTRONIC MAIL* |

*/s/ Brian P. Egan*

Brian P. Egan (#6227)